United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Francisco Lagos Marmol and<br>Fernando Van Peborgh, Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 22-20703-Civ-Scola |
| Kalonymus Development Partners,<br>LLC, Defendant. | ) ) ) | |
| Kalonymus Development Partners,<br>LLC, Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 22-20881-Civ-Scola<br>(Consolidated Case) |
| Francisco Lagos Marmol and<br>Fernando Carlos Van Peborgh,<br>Defendants. | ) ) ) ) | |

### Omnibus Order

In what remains of this consolidated case, Plaintiff Kalonymus Development Partners, LLC (the "Buyer"), seeks to enforce its agreement with Defendants Francisco Lagos Marmol and Fernando Van Peborgh (the "Sellers"), requiring them to sell their interests in Best Peacock Inn, LLC. (Pl.'s Compl., ECF No. 35-2.) The Buyer also claims it is entitled to recoup the losses it incurred when, according to the Buyers, the Sellers breached the parties' agreement. (*Id.*) In particular, the Buyer seeks specific performance and monetary damages through its claims for breach of contract (counts one through three) and negligent misrepresentation (count four).[1] (*Id.*) Now before the Court is the Buyer's motion for summary judgment in which it seeks judgment on all its claims. (Pl.'s Mot., ECF No. 78.) That motion has been fully briefed (Defs.' Resp., ECF No. 84; Pl.'s Reply, ECF No. 88), along with the parties' supporting statement of facts (Pl.'s Stmt. of Facts, ECF No. 79; Defs.' Resp. Stmt., ECF No. 83; Pl.'s Reply Stmt., ECF No. 89) and is ripe for resolution. Additionally, the Sellers have filed a motion to supplement the record (Defs.' Mot. to Suppl., ECF No. 111) which has also been fully briefed (Pl.'s Resp. to Mot. To Suppl., ECF No. 119; Defs.' Reply to Mot. to Suppl., ECF No. 127). For the reasons set forth below, the Court **grants in part and denies in part** the Buyer's motion for summary judgment (**ECF No. 78**) and **grants in part and denies in part** the Sellers' motion to supplement the record (**ECF No. 111**).

---

[1] Previously, the Court dismissed the Sellers' case against the Buyer in which the Sellers sought declaratory relief, asking the Court to find, among other things, that the Buyer, rather than the Sellers, breached the parties' agreement. (Order, ECF No. 92.)

## 1. Background[2]

In mid-2021, the Buyer and the Sellers entered into a written agreement (the "Agreement") though which the Sellers agreed to sell their membership interests (50% each) in Best Peacock to the Buyer. Best Peacock, in turn, owns real property located at 3677 Poinciana Avenue, in Miami, Florida, including two single-family homes and twelve apartment units (the "Real Property"). The parties initially agreed on a sales price of $5,450,000 with a closing date on or before October 8, 2021.[3] Notably, the Agreement provides that "time shall be of the essence with respect to the Closing and all obligations of the parties hereto." (Agmt. § 6.14, ECF No. 77-3.)

At some point in October 2021, the Sellers notified the Buyer that their lender, holding a mortgage on the Real Property, would only provide a payoff and satisfaction of mortgage during the first quarter of any given year—in other words, only from January through March. Despite this restriction's being included in their own mortgage documents, the Sellers both admit having been unaware of the limitation. Because of this restriction, the Sellers were unable to close as required by the Agreement.

Under the Agreement, in the "event of a default by Seller," the Buyer has "the sole and exclusive remedies of either": (1) terminating the Agreement and receiving the return of its deposit or (2) "proceeding to enforce [the] Agreement *by an action* for specific performance, . . . without waiving Buyer's right to recover any and all losses, damages, costs and expenses resulting from Seller's default." (Agmt. § 8.2 (emphasis added).)[4] The Sellers offered to close after January 1, 2022, but without compensating the Buyer for any damages the Buyer claimed it was due because of the untimely closing. Instead, the Buyer, claiming to avail itself of the second remedy under the Agreement, filed suit in state court (later removed to this Court), against the Sellers, in December 2021, seeking specific performance and monetary damages.

At the heart of much the parties' dispute regarding the Buyer's motion for summary judgment is the interplay between the Buyer, two putative assignee LLCs, and the members of those entities. The Sellers insist that the Buyer, prior to the deal's falling apart, assigned its interest in the Agreement to

---

[2] Unless indicated otherwise, the facts presented below are undisputed.

[3] The Buyer says the closing date was extended, to late October, and that the parties agreed to a reduced price of $5.15 million. The Sellers appear to dispute both contentions (Defs.' Stmt. ¶ 10) but neither fact appears to be material to the Court's assessment of the Buyer's motion.

[4] The Sellers view the second option as requiring the Buyer to close, "without waiving the Buyer's right to damages." (Defs.' Stmt. ¶ 27.) As the Court has previously concluded, this mischaracterizes the Agreement. (Order at 3 n. 3.)

two affiliated LLCs: 3667 Poinciana, LLC,[5] and Poinciana, LLC (together the "Poinciana Entities"). (Defs.' Stmt. ¶¶ 23–24.) Alternatively, the Sellers say that, even if the Buyer didn't execute the assignment to the Poinciana Entities, it always intended to make the assignment and, therefore, never planned to actually own Best Peacock itself, even if the deal had closed. Either way, the Sellers' position is that the Buyer, because of the assignment or intended assignment, incurred no damages itself as a result of the breach. The Buyer, on the other hand, insists it never actually executed the assignment, prior to the deal's falling apart, but does not deny that it, indeed, always *intended* to make the assignment in conjunction with closing the transaction on Best Peacock.

Much of the remainder of the parties' dispute centers around whether, as an assignor or anticipated assignor, the Buyer actually suffered any of the damages identified by its expert, Paul Habibi. According to Habibi, the Buyer's monetary damages amount to $1.79 million in increased financing costs; $98,765 in lost rental profits; $50,650 in duplicative closing expenses; and $16,783 in inferior tax treatment associated with depreciation. (Pl.'s Stmt. ¶¶ 32–35.) In response, the Sellers point to portions of Habibi's deposition testimony (Habibi Dep., ECF No. 98-1) that conflict with his report's conclusion that the Buyer itself suffered these damages. Through that testimony, as the Sellers frame it, Habibi repeatedly conflates the parties and entities who may have been financially harmed by the failed transactions, introducing an unacceptable level of conflict as to whom the damages really flow, as between the Buyer, the Poinciana Entities, and all their members.

## 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S.

---

[5] For clarity, the Court notes that, although the parties identify the street address of the Real Property as 3677 Poinciana Avenue, the LLC is named 3667 Poinciana.

144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

"When the plaintiff moves for summary judgment and also bears the burden of proof on a claim at trial," as here, "then the plaintiff must affirmatively show that no genuine dispute exists as to any material fact relevant to the plaintiff[']s claims and must produce such evidence as would entitle the plaintiff to a directed verdict if not controverted at trial." *Lodge v. Kondaur Capital Corp.*, 1:10-CV-0736-WCO-LTW, 2012 WL 12868850, at *3 (N.D. Ga. Dec. 4, 2012), *rep. & rec. adopted*, 1:10-CV-736-WCO-LTW, 2013 WL 12092555 (N.D. Ga. Jan. 29, 2013), *aff'd*, 750 F.3d 1263 (11th Cir. 2014) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)). Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, admissions on file and other documents, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Id.*; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.* "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

### 3. Analysis

Arguing that the undisputed facts demonstrate that it has established all three elements of a breach-of-contract claim as well as the elements of its negligent-representation claim, the Buyer asks the Court to enter summary judgment in its favor as to all four counts. The Sellers, in opposing the Buyer's motion submit (1) because the Buyer is seeking specific performance and because the Sellers, since January 2022, have been willing to proceed with closing, it is the Buyer, and not the Sellers, who has breached the Agreement; (2) the Buyer is not entitled to recover the damages it claims as any damages incurred were or would be suffered by third parties, not the Buyer; and (3) the Buyer's negligent-misrepresentation claim fails for lack of entitlement to damages and for being duplicative of its breach-of-contract claims. As explained below, the Court finds the Buyer has established all the elements of its breach-of-contract claims but not its negligent misrepresentation claim.

Additionally, while the Court find summary judgment warranted as to the Buyer's entitlement to specific performance, it is not convinced that the Buyer is entitled to summary judgment as to the amount of damages it claims should be awarded.

### A. The Buyer has established its entitlement to summary judgment as to each element of its breach-of-contract claims.

The parties do not dispute that, under Florida law, the elements of a breach of contract claim are "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). As to these elements, there is no real dispute as to the first two. One, the parties' Agreement is a valid contract between the Buyer and Sellers requiring the Sellers to provide "[a]n Affidavit of Seller, attesting that Company has good and marketable title to the [Real] Property, subject only to current taxes and the existing mortgage to be satisfied out of the Closing proceeds at Closing" and that "time shall be of the essence." (Agmt. §§ 3.1, 6.14.) And two, the Sellers, by their own acknowledged fault, were unable to close in October 2021, and thus, as the Sellers do not legitimately dispute, breached the contract. (*E.g.*, Defs.' Stmt. ¶ 12; Defs.' Resp. at 2 (referring to the Sellers' "inability to close" until January 2022).)

Where the parties' views diverge is at the damages element. Notably, however, the Sellers do not deny that damages, generally, resulted from their breach. Instead, they say, (1) the Buyer excused any Seller default that might have resulted in any damages; and (2) to the extent the Sellers' breach was not excused, any damages that resulted flowed to another entity, not the Buyer. As explained more fully below, the Court does not find that the Buyer excused the Sellers' default nor does the Court find the Sellers' argument compelling with respect to the Buyer's claim for specific performance. This alone is enough to establish the damages prong of the Buyer's claim for breach of contract. And, as explained more fully below, the Court's finding that the Buyer has failed to carry its burden in establishing its entitlement to the *specified* monetary damages it seeks, does not mean the Buyer has failed to show that it was nonetheless damaged by the breach.

### (1) The Sellers fail to show that the Buyer excused the Sellers' default or that the Buyer itself breached the parties' contract.

As an initial matter, the Sellers' contention that the Buyer is in breach of the Agreement because it is preventing the Sellers from now performing is misplaced. As the Sellers describe it, the Buyer, by seeking specific performance, manifested its intention to proceed with the parties' Agreement,

leaving the Buyer obligated to perform. And, say the Sellers, when they offered to proceed with the closing, in early 2022, and the Buyer refused—instead demanding in excess of $1 million to proceed—the Buyer effectively "repudiated the [Agreement] and committed its own material breach." (Defs.' Resp. at 7.) Essentially, the Sellers appear to equate, on the one hand, the Buyer's quest for specific performance through court intervention, with, on the other, the Buyer's having chosen to proceed with the contract, despite the Sellers' breach, as if waiving the default. The Court finds their position unavailing.

To start, the cases the Sellers rely on to support their position are inapplicable. For instance, in *Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, a shipping company sought to avoid paying pre-judgment interest it owed to a shipyard for repairs made to the shipping company's cargo vessel. 329 F.3d 809 (11th Cir. 2003). The shipping company complained that it shouldn't have to pay the eighteen-percent interest to the shipyard, specified in the parties' contract, because the shipyard's negligence, which damaged the ship, amounted to a breach of the parties' contract, thus nullifying their agreement. *Id.* at 816. Both the appellate and the trial courts disagreed with the shipping company, noting that the shipping company chose to continue to rely on the shipyard, after the damage, to complete the repairs under the parties' contract, and therefore remained bound by the contract's terms. *Id.* at 817. Here, in contrast, there is no indication that the Buyer sought to proceed with the contract, waiving the Sellers' default. The Sellers' summary insistence to the contrary, that the Buyer "unequivocally reaffirmed the [contract]," "clearly manifesting its intention to continue under the [contract]" (Defs.' Resp. at 6), is unsupported. Instead, the Buyer informed the Sellers that it would only proceed with the closing if the Sellers compensated the Buyer for the Sellers' default. This is not the same as, in *Merrill*, the non-breaching party's decision to move forward with the contract, without complaint, despite the other party's purported default.

Nor does *GPDEV, LLC v. Team Sys. Int'l, LLC*, help the Sellers. 4:18CV442-RH-MAF, 2021 WL 8015621 (N.D. Fla. Feb. 22, 2021). There, in defending against a breach-of-contract claim, the defendant argued the plaintiffs failed to supply all the water they were supposed to provide under the parties' contract. The court rejected the defendant's position, however, pointing to record evidence showing that the defendant continued, after the alleged default, to urge the plaintiff to nonetheless carry on and find other water suppliers to meet the shortfall. According to the *GPDEV* court, the defendant, by proceeding with the contract, waived its right to rely on the plaintiffs' default in seeking to avoid its own performance. *Id.* at *3. Once again, those facts, like the facts in *Merrill*, bear little resemblance to the scenario now before the Court. Here, in contrast, there is no record evidence that the Buyer, unlike in

*GPDEV*, ever "continu[ed] to perform or accept[ed] performance under the contract and receiv[ed] the benefit of it." *Id.* Indeed, to the contrary, as the Sellers themselves point out, the Buyer repeatedly refused the Sellers' efforts to proceed with closing on the transaction. (Defs.' Resp. at 6–7 ("[The Buyer], however, refused to close and instead demanded an extra-contractual reduction of the purchase price.").)

The Sellers' insistence that the Buyer's resort to court action, through which it seeks specific performance (along with damages to afford it the full benefit of its bargain), amounts to the Buyer's "unequivocal[] reaffirm[ation]" of the contract, is unsound: if anything, seeking court intervention manifests the very opposite of a "conclusive choice" to excuse the other party's default. *GPDEV*, 2021 WL 8015621 at *3. Accordingly, because there is no support for the Sellers' claim that the Buyer ever reaffirmed the contract, post the Sellers' default, there is no way the Court could conclude that the Buyer itself then committed its own material breach.

**(2) The Sellers' argument that the Buyer was not in any way damaged by the breach is unavailing.**

Next, the parties quarrel over whether the Buyer itself—as opposed to an assignee, or potential assignee—was damaged by the Sellers' default. According to the Sellers, "the undisputed evidence shows [the Buyer] was never intended to be either the ***buyer*** or the ***borrower*** in connection with the . . . transaction." (Pls.' Resp. at 8 (emphasis in original).) The Sellers' argument is essentially twofold: (1) the Buyer assigned its interests under the parties' contract to the Poinciana Entities; and (2) even if the assignments have not yet taken place, the Buyer's intention, in any event, was always to effect the assignment in conjunction with the closing of the transaction. (Defs.' Resp. at 8–10.) Either way, say the Sellers, no damages would ever flow to the Buyer itself. (*Id.* at 8–10.) In countering, the Buyer acknowledges that it indeed *intended* to "assign its rights under the [Agreement]," but that the assignment was "expressly contingent" on the closing of the transaction in October 2021. (Pl.'s Reply at 7–8.) Further, the Buyer argues, without the execution of an assignment, all damages would flow to the Buyer as the entity in privity with the Sellers, regardless of any intentions as to a future assignment. (*Id.* at 9.) For the most part, the Court agrees with Buyer and finds the Sellers' position to generally miss mark.

In support of their theory that the "true ***buyer***" in the transaction was actually the Poinciana Entities, the Sellers point to documents prepared by the Buyer's attorney, geared towards the closing of the deal. (Defs.' Resp. at 3 (emphasis in original).) Those documents, sent to the Sellers' attorney for review, in October 2021, identify the Poinciana Entities as "Buyer," "relating to

the purchase of 100% of the LLC membership interest in Best Peacock." (Defs.' Stmt., Ex. D., ECF No. 83-4, 5.) Also included is a document titled "Assignment of Membership Interests" which recites that the Sellers have agreed to transfer their interests in Best Peacock to the Poinciana Entities, "as assignee of [the Buyer]." (*Id.* at 9.) Other documents the Sellers rely on, which appear to have been prepared by their own attorney, also describe the putative transaction as involving a sale of the Sellers' interests to the Poinciana Entities. (*Id.* at 14, 16, 17.) The Sellers say that, taken together, these documents, along with a rate-lock agreement with the putative lender, are "a clear representation that the assignment had already taken place." (Defs.' Resp. at 8 (citing Exhibits C and D, attached to Defs.' Stmt.).)

Worth mentioning at the outset, as the Court considers the Sellers' argument, is that the Sellers describe this information as "new facts" that "have come to light revealing that [the Buyer] was never intended to acquire Best Peacock." (Defs.' Resp. at 3.) But these documents have been in the Sellers' possession since before the Buyer initiated its suit. The timing, then, of the Sellers' sudden concern, well over a year after the Buyer initiated its case, about whether the Buyer is entitled to recover the damages it seeks, undermines their position. Indeed, to the extent the Sellers' intent is to raise the Buyer's contractual capacity or authority to sue, the Court finds the argument waived. *See Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005) (finding that the "assertion of a party's incapacity to sue should fall within the class of threshold defenses—issues that must be raised and disposed of at the outset of the suit") (cleaned up) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1295 (3d ed.2004)).[6]

Aside from waiver, however, the Court also finds the Sellers' arguments as to the assignment legally, factually, and conceptually infirm as well. First, the Sellers present no legal authority for their supposition that the documentary evidence they rely on would suffice to support their claim that the Buyer assigned all its rights under the parties' Agreement, including the right to file suit and collect damages, to the Poinciana Entities. Instead, the Sellers rely on caselaw that explains only what the effect of an actual assignment is and the interests that may be transferred by way of an assignment. (Defs.'

___

[6] Notably, to assure itself of its subject-matter jurisdiction over this case, after the Sellers repeatedly referenced doubts as to the Buyer's "standing," the Court ordered the Sellers to either clarify that they were not challenging the Buyer's constitutional standing or file a motion to dismiss. (Paperless Order, ECF No. 134.) In response, the Sellers filed a legal memorandum, rearguing their position that the Buyer cannot prove it suffered any damages. (Defs.' Not., ECF No. 135.) While the Court struck the memorandum, because it improperly presented uninvited legal argument, the Court notes that the Sellers are not, in fact, challenging the Court's subject-matter jurisdiction.

Resp. at 8–9 (citing to *Price v. RLI Ins. Co.*, 914 So. 2d 1010 (Fla. 5th DCA 2005) to describe what rights are vested in an assignee by way of a valid assignment).) Missing, however, is any legal support or authority that the evidence the Sellers rely on is sufficient to show that an assignment of the Buyer's rights, in whole or in part, was ever effected. Without any description of what is required to establish an assignment under Florida law, the Court is unwilling to pass on the Sellers' bare conclusory argument that the Buyer assigned away any right it had to, at a minimum, litigate this case or recover damages. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 (10th Cir. 2001) ("Because appellants have failed to support this distinction with any authority, legal or otherwise, we need not consider it.); *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (Posner, J.) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The Court] will not do his research for him.").

Intertwined with the legal deficiency of the Sellers' argument, are its factual and conceptual shortcomings. To defeat the Buyer's motion for summary judgment as to the Buyer's entitlement to damages generally, the Sellers must designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. Further, this evidence must be significantly probative to support the Sellers' opposition. *Anderson*, 477 U.S. at 249. Although the Sellers attempt to frame their assignment argument as establishing a genuine issue of material fact as to the Buyer's prima facie showing of damages, their argument, at bottom, amounts to an affirmative defense. That is, the Sellers' argument is that, essentially, even if the Buyer had established its breach-of-contract claim, including its entitlement to damages, the Sellers seek to nonetheless avoid liability by pointing to the assignment. *See Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013) (Cohn, J.) ("An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters."). Indeed, in other briefing, the Sellers themselves treat their assignment arguments as falling within the ambit of their third and fifth affirmative defenses (labeled "No Damages" and "Causation," respectively). (Defs.' Mot. for Leave to File Surreply, ECF No. 94, 2 (citing Sellers' Ans, ECF No. 20, 7).) As such, and in light of the lack of any legal guidance from the Sellers, the Court sees no way around laying the burden of establishing the assignment at the feet of the Sellers. *See Paladin Shipping Co. Ltd. v. Star Capital Fund, LLC*, 491 F. App'x 42, 44 (11th Cir. 2012) ("[T]he burden of proving each element of an affirmative defense rests on the party that asserts the defense."). To find otherwise would put the Buyer in the untenable position of being required to prove a negative—that it did *not*

make the assignment.

Considered in this light then, the factual underpinnings of the Sellers' opposition fall far short. While the references to the assignment that the Sellers identify certainly raise the specter of an assignment from the Buyer, they do no more than that. This is especially so in light of the Buyer's directly contrary position, supported by testimony from Maximillian Zeff, the Buyer's sole member, indicating that the documents upon which the Sellers rely (to show the contemplated assignment) were never actually executed by the Buyer. (Zeff's Aff. ¶¶ 7, 10 ECF No. 77-11; Zeff's Dep. 11:19–22, ECF No. 77-14 ("This assignment agreement was never, to my recollection, was never mutually agreed upon. It was never finalized or approved by both parties as a final assignment nor by the title company.").) Without more, the evidence the Sellers focus on, even when viewed in the light most favorable to them and drawing all reasonable inferences in their favor, does not overcome the Buyer's showing. And the Sellers' evidence would not come even close to warranting judgment in their favor on the basis of their assignment defense. *See Residential Funding Co. v. Terrace Mortg. Co.*, 850 F. Supp. 2d 961, 964–65 (D. Minn. 2012), *aff'd sub nom. Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910 (8th Cir. 2013) ("[O]ne who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense.") (cleaned up). Accordingly, the Sellers' attempt to challenge the Buyer's motion for summary judgment, based on their theory that the Buyer assigned all its rights to the Poinciana Entities, fails.

Nor is the Court persuaded by the Sellers' alternative argument that, even if the Buyer had not yet executed the assignment, it intended to and therefore the Buyer itself never would have suffered any damages. The case on which the Sellers themselves rely lays bare the weaknesses of this argument. In that case, the Court recited the unremarkable contract-law concept that, in Florida, "the injured party in a breach of contract action may recover damages that will put the party in the same position they would have been in had the other party not breached the contract." *Christie v. Royal Caribbean Cruises, Ltd.*, 497 F. Supp. 3d 1227, 1233 (S.D. Fla. 2020) (Scola, J.). If the Sellers had not breached the Agreement, the Buyer would have taken possession of Best Peacock in October 2021, when various conditions pertaining to that ownership were, according to the record, more favorable than they are now. Because the closing never happened, the Buyer was unable to make the contemplated assignment of Best Peacock. In litigating this breach-of-contract case, the Buyer seeks exactly what the Sellers themselves say the law allows: specific performance and to recover any damages that, together, will put the

Buyer in the same position it would have been in had the contract proceeded with closing in October 2021, exactly as required by the parties' Agreement. The Court readily concludes that regardless of which entity was ultimately going to take ownership of Best Peacock, the Buyer did not receive the benefit of its bargain and was, therefore, damaged as a result of the breach.

### (3) The Amount of Damages

Although the Court has no difficulty concluding that the Buyer proved it was damaged by the Sellers' breach, the parties' dispute regarding the amount of damages that should be awarded is not so straight forward. These issues are brought to light primarily through the parties' dueling *Daubert* motions, seeking to exclude each other's expert's opinions; the deposition of the Buyer's expert, Paul Habibi; and the briefing of the Sellers' motion to supplement the record. (Pl.'s Mot. to Exclude, ECF No. 97; Defs.' Mot. to Exclude, ECF No. 98; Habibi Dep., ECF No. 98-1; Pl.'s Mot. to Suppl., ECF No. 111.) The Sellers, in their motion to supplement, argue that, not only should the Court consider the parties' *Daubert* motion briefing, particularly in light of Habibi's deposition, in evaluating the Buyer's motion for summary-judgment, but that the Court should fully resolve the *Daubert* motions before ruling on the motion for summary judgment as well. (Defs.' Mot. to Suppl. at 3.) In response, the Buyer raises no real objection to the Court's consideration of the parties' experts' deposition testimony, or even their *Daubert* briefing, except to the extent the Sellers seek to use that briefing as a backdoor opportunity to renew their summary-judgment opposition arguments. (Pl.'s Resp. to Mot. to Suppl., ECF No. 119.) The Court agrees with the Buyer here: to the extent the expert's depositions and the parties' dueling *Daubert* briefing relate to the evidentiary underpinnings of the Buyer's motion for summary judgment, the Court will consider them. On the other hand, the Court will not consider any aspect of that briefing through which the Sellers are simply recycling or adding to their summary-judgment arguments. Nor does the Court find resolution of the Sellers' *Daubert* motion necessary to resolve the Buyer's motion for summary judgment, as more fully explained below.

To recap the damages at play here, in addition to seeking specific performance, the Buyer also seeks a monetary award to compensate it for the Sellers' failure to timely perform. As set forth above, the Buyer says the damages that flow from the breach of contract include "(1) $1.79 million in the increased cost of capital to close on the Real Property; (2) $98,765 in lost rental income from the Real Property; (3) approximately $50,650 in administrative fees in order to duplicate the transaction; and (4) $16,783 in inferior tax treatment." (Pl.'s Mot. at 13.) In support of these figures, the Buyer points to Habibi's report. (*Id.*; Pl.'s Stmt. at ¶¶ 32–35; 42–45 (citing Habibi Rep. at ¶¶ 8,

22–23, 31–33, 36–52, 56–62).) In challenging Habibi's analysis, the Sellers highlight various portions of his deposition where he expresses, at a minimum, a lack of clarity as to whether his damages calculations apply to the Buyer or to some other entity or individual. (Defs.' Mot. to Suppl. at 4–9.) While the Court disagrees with the Sellers that these discrepancies, between Habibi's report and deposition, warrant the striking of Habibi's opinion, at least at this juncture, the Court is persuaded that the inconsistencies leave the Buyer unable to secure the damages it seeks in the context of its summary-judgment motion.

　　　　Throughout his report, Habibi primarily identifies the damages he has calculated as having been suffered by the "Plaintiff," defined as Kalonymus Development Partners, LLC—what the Court has been calling the "Buyer."[7] However, throughout his deposition, when pressed by opposing counsel, Habibi repeatedly lumped multiple entities and parties together in defining the plaintiff and referenced other entities who, in his view, actually suffered the damages occasioned by the breach. For example, he testified that he considers "Kalonymus to include the extension of all it[]s related parties and affiliates" (Habibi Dep. at 33:2–3) and that, in his analysis, he "didn't distinguish between various entities or interest within the Zeff family" (*id.* at 61:3–5), finding it unimportant "to distinguish between Poinciana, LLC, 3667 Poinciana, LLC, Kalonymus, LLC, Max Zeff personally, any family entities" (*id.* at 62:1–4). Habibi also agreed with opposing counsel that he wasn't "really trying to calculate Kalonymus, LLC's damages," but really the damages that were suffered by Zeff and his companies (*id.* at 138:9–14), conceding that the parties that actually suffered the damages he identified in his report are "not plaintiffs in this case" and "not Kalonymus, LLC" (*id.* at 146:16–22).

　　　　According to the Sellers, these discrepancies, between Habibi's report and deposition testimony, render Habibi's opinion inadmissible. Accordingly, the Sellers argue, the Court should strike his testimony, in its entirety. And, the Sellers continue, since Habibi's expert opinion is the only evidence supporting the Buyer's claims for damages, striking it and his testimony not only dooms the Buyer's motion for summary judgment in its entirety, but also warrants the granting of summary judgment in favor of the Sellers. (Defs.' Mot. to Suppl. at 2, 9 n. 6.) As an initial matter, the Sellers' request that summary judgment be entered in their favor—whether in their opposition briefing, in their motion to supplement the record, or in their *Daubert* motion—is denied. It is procedurally improper for the Sellers to seek summary judgment only in

---

[7] The Court notes that in one instance in his report, Habibi references "Plaintiffs," plural. But this seems to be an isolated reference and doesn't really affect the Court's analysis. (Habibi Rep. ¶ 40.)

passing and well beyond the deadline to do so. Their request is also lacking substantively as the Sellers overstate the tension between Habibi's report and his testimony.

 Additionally, while the Court finds Habibi's deposition testimony decidedly problematic, at the same time the Court looks to the cause of Habibi's difficulties for context. In doing so, the Court recognizes that much of Habibi's inconsistent testimony appears occasioned by two central issues: the common membership of the many related LLC entities involved in this case and opposing counsel's repeatedly pressing Habibi to opine on the legal construct of the entities involved and which entity or individual, as a member of that entity, would legally suffer damages occasioned by the breach. As to the first issue, there appears to be no dispute that Zeff is the sole member of both the Buyer as well as Poinciana, LLC, and one of the only two members of 3667 Poinciana, LLC. (*E.g.*, Zeff Aff. at 2; 3667 Poinciana Op. Agmt., ECF No. 83-1, 2; Poinciana Op. Agmt., ECF No. 83-2, 2; Defs.' Stmt. ¶¶ 67–68.) Accordingly, it is not surprising that Habibi, not a lawyer, might not be as discerning in identifying which particular entity or individual would ultimately suffer the economic consequences of the failed transaction. Realistically, Zeff, as a member of all the entities involved in the transaction would suffer, through his entities, some financial harm: whatever entity ends up holding the property will pay a higher interest rate to finance it; whatever entity that closes on the property will incur duplicative costs to prepare for the transfer; the individual members of whatever entity that ends up holding the property will receive less favorable tax treatment. Habibi's improperly lumping together the multiple entities and Zeff, in considering to whom the damages would ultimately flow, realistically, is understandable to the Court in light of the commonality of membership and artful questioning by opposing counsel.

 The near unity of membership between the assignor and the assignee here conceptually blurs the flow of financial harm resulting from the breach. To put this in perspective, the Court overlays the facts here onto a hypothetical, arm's-length transaction, where the correlation of damages between an assignee and an assignor is more readily appreciated. For example, in an arm's length, fair-market transaction, assume Company A has agreed to sell property to Company B for $95 in October 2021. In anticipation of the closing, Company B has arranged to assign the property to Company C in exchange for $100 from Company C. If Company A, however, breaches its agreement with Company B, and Company B is therefore unable to transfer the property to Company C until 2023, Company C, based on market conditions, might now be willing to pay only $60 for the property. This means, theoretically—depending, of course, on other components of the transaction—that Company B has suffered $40 in damages because of Company A's breach: instead of earning $5 in profit, it will

incur a $35 loss on the transfer to Company C. To put this hypothetical transaction into perspective, in consideration of the facts here, while Company C will ultimately be the entity paying more in interest on its financing and Company C's members will be the ones losing out on tax advantages no longer available, Company C's losses, in this scenario, are baked into the lower price it paid to Company B for the property. This leaves Company B alone, in this simulated scenario, to incur the loss occasioned by Company A's breach. But where, as here, both Company B and Company C are, in effect, owned by the same person or family, and the transaction appears to be arm-in-arm, the correlation of damages incurred by the parties is not necessarily so clear cut.

 Further contributing to Habibi's problematic testimony appears to have been opposing counsel's repeatedly pressing Habibi to acknowledge that Zeff himself, along with all the other entities involved, would suffer some manner of financial consequences resulting from the Sellers' breach. (*See, e.g.*, *id.* at 55:4–9 ("These [cost-of-equity] damages would have been suffered by the members of the LLCs that were going to acquire my client's membership interest?"); 57:10–12 ("So Max Zeff and the other members of these LLCs, they would have suffered the damages that you're alluding to, correct?"); 59:13–21 (pressing Habibi to acknowledge that the cost-of-equity damages would be suffered by the assignees and Zeff); 66:8–10 ("So the party that suffers the damages is the actual borrower, which is the person that actually has to pay the loan, correct?"); 105:1–5, 13–16; 143:15–19; 143:24–144:20; 146:16–22 ("So the entities and Max that suffered the damages that you're referring to . . . they are not plaintiffs in this case, correct?").) This questioning led Habibi to decouple, on the one hand, the financial consequences felt downstream of the failed transaction from, on the other, the legal significance of those harms in calculating the damages the breach inflicted onto the Buyer itself.

 The Court's appreciation of why Habibi may have intermingled the parties, however, does not detract, though, from what seems to be an inescapable conclusion that Habibi's inconsistent testimony introduces an unacceptable level of uncertainty into the Court's evaluation of his report. While Habibi's report consistently attributes the calculated damages as being suffered by the Plaintiff alone, Habibi's deposition answers raise genuine issues of fact as to: how the increased $1.79 million cost of capital and $16,783 loss of tax treatment translate into damages incurred by the Buyer; and how the duplicate closing fees damages of $50,650 are attributable to the Buyer. Accordingly, as to the dollar amounts of those damages, the Court finds the Buyer's motion deficient on that ground alone.

 As a separate matter, the Court also finds Habibi's report as to the $98,765 lost-profit damages lacking. First, Habibi acknowledges that his calculation is an estimate, based only on profit-and-loss statements from

August and September 2021 and rental-increase letters sent to units in April 2022. (Habibi Rep. at 17.) Habibi readily admits, though, that in order to provide a more accurate calculation, he would need access to the Sellers' complete record of profit-and-loss statements. (*Id.* at 18.) Further, the Court agrees with the Sellers' assessment, as Habibi also acknowledged, that any profits would ordinarily flow, at least initially, to Best Peacock. (Defs.' Mot. to Suppl. at 6, 6 n. 3; Habibi Dep. at 115:13–21.) Thus, missing from Habibi's analysis is whether Best Peacock retained those profits or whether those profits or a portion of them were distributed out of the LLC. Without this information, the Court is unable to reasonably infer, based on the record as it stands, whether the Buyer will suffer a loss as to this income when the Best Peacock interests are ultimately transferred.

Finally, as to the Sellers' insistence that its *Daubert* motion, seeking to exclude Habibi, must be resolved before Court rules on the Buyer's motion for summary judgment, the Court disagrees. To start, those aspects of the Buyer's motion that the Court has granted do not, contrary to the Sellers' position, rest on Habibi's opinions: the Court's conclusion that the Buyer established it was damaged by way of the Sellers' breach does not rely on Habibi's testimony. Further, to the extent the Buyer looks to Habibi's report to support the *amount* of monetary damages it seeks, the Court finds the Buyer's showing deficient. Accordingly, since Habibi's opinion is not "necessary to resolving" the Buyer's summary judgment motion, it declines to rule on the merits of the Sellers' motion to exclude before ruling on the Buyer's motion. *Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, 21-21573-CIV, 2022 WL 1238665, at *9 (S.D. Fla. Apr. 14, 2022) (Lenard, J.); *cf. Miller v. City of Fort Myers*, 424 F. Supp. 3d 1136, 1142 (M.D. Fla. 2020) ("[T]ypically, courts consider *Daubert* motions only as needed to resolve summary judgment.").

Additionally, upon a preliminary review, the Court is not convinced that, just because Habibi's deposition testimony expressed a blurring of the intersection of business forms and damages in this case, does not necessarily result in the striking of his opinions altogether. This is especially so where this matter will be proceeding by bench trial and opposing counsel will have a fulsome opportunity to vet Habibi's opinions through a robust cross examination and the presentation of other evidence. Conceptually, there appears to be little dispute that Best Peacock, if transferred to the Buyer by way of the parties' Agreement now, will require more money to finance (in terms of increased interest rates and various closing costs) and comes with fewer advantages, like more favorable depreciation tax treatment to the eventual individual taxpayer than if the Sellers had closed in October 2021—regardless of what entity ultimately ends up holding the interest. Again, regardless of any assignment, there appears to be no real dispute, thus far, that what the Buyer

will receive in 2023, as compared to what it would have received in 2021, is less advantageous, ultimately denying *the Buyer* the full benefit of its bargain—at least to some extent. How that "less advantageous" posture translates into actual monetary damages due to the Buyer remains to be seen; but the Court has no difficulty concluding, even without an expert opinion, that those damages are something greater than zero.

### B. Negligent Misrepresentation Claim

As to the Buyer's negligent-misrepresentation claim, the parties' disagreement is two-fold. First, the Sellers perfunctorily point to the same assignment-based arguments they presented in defense of the Buyer's breach-of-contract claims. And, second, they quarrel over whether the Buyer's negligent-misrepresentation claims arise independently from its breach-of-contract claims. Although the Sellers' assignment-based arguments fail, for the same reasons as set forth above, the Court agrees with them that the Buyer has not shown that the damages claimed through the Buyer's tort claim are separate and distinct from the damages it says stem from its breach-of-contract claim.

While the Buyer acknowledges the bar on being able to seek damages in tort that are not distinct from its breach-of-contract claims, it nonetheless insists that the Sellers negligent acts "occurred outside the bounds of the [parties' Agreement]." (Pl.'s Reply at 9.) According to the Buyer, the Sellers' negligent acts include failing to review their mortgage documents; failing to tell the Buyer, until the evening before closing, that they could not pay off their mortgage in time for closing; refusing to compensate their lender for capital-gains tax in order to be able to pay off the mortgage early; and allowing their transactional counsel to continue to exchange documents with the Buyer's counsel up until the eve of closing despite not being able to satisfy the closing conditions. (*Id.* at 10.) Presenting no legal authority or other analysis, the Buyer simply insists that these "negligent acts" are "independent from just breaching the contract." (*Id.*) Without more, the Court fails to see how.

All the identified misrepresentations "simply ha[ve] to do with [the Sellers'] failure to perform under the contract." *Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020) ("It is a fundamental, long-standing common law principle that a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract."). Further, the Buyer utterly fails to demonstrate, as it must, that any "damages stemming from th[e] misrepresentation[s] [are] independent, separate and distinct from the damages sustained from the contract's breach." *Id.* at 1239–40. Accordingly, the Buyer's motion for summary judgment on its negligent-misrepresentation claim fails.

### C. Affirmative Defenses

In its motion, the Buyer submits that none of the Sellers' affirmative defenses preclude the Court's entry of summary judgment. (Pl.'s Mot. at 15–20.) In opposition, the Sellers do not explicitly argue their affirmative defenses, as affirmative defenses, but in substance they address some of them though their arguments that (1) the Buyer itself did not suffer any harm because it either assigned its rights under the Agreement or was going to do so (*see* Defs.' Aff. Def. at 7 ("Third Affirmative Defense (No Damages)"); (2) the Buyer failed to mitigate or avoid its damages (*see id.* ("Fourth Affirmative Defense (Failure to Mitigate)"; "); and (3) the Buyer waived the Sellers' breach and then itself breached the Agreement (*see id.* at 7–8 ("Fifth Affirmative Defense (Causation)"; Sixth Affirmative Defense (Waiver); "Seventh Affirmative Defense (Termination of Agreement)"; "Ninth Affirmative Defense (Prevention of Performance).") All of these arguments have been addressed and dispensed with, as set forth in great detail, above.

Despite the Sellers' response, the Buyer complains that the Sellers' "Opposition does not mention any of the Sellers' Affirmative Defenses, let alone even attempt to rebut any of [the Buyer's] arguments related to them." (Pl.'s Reply at 11.) And, the Buyer says, because the Sellers have, as the Buyer describes it, "abandoned these defenses," the Buyer is, consequently, "entitled to summary judgment on each of the Sellers' Affirmative Defenses." (*Id.*) The Court disagrees. First, seeking summary judgment on the Sellers' affirmative defenses for the first time in a reply brief, is procedurally improper. Further, since none of the Sellers' affirmative-defense related arguments succeeded in overcoming the Buyer's arguments as to the Sellers' liability, granting summary judgment on those defenses, again as to the Sellers' liability, is unnecessary.

Finally, the Buyer presents no legal authority supporting the proposition that, where a court denies a plaintiff's motion for summary judgment on grounds other than a defendant's affirmative defenses, that it must then deem any affirmative defenses not raised abandoned as to remaining aspects of the litigation. An example illustrates the point. Imagine a defendant who knows that it can readily defeat a plaintiff's motion for summary judgment by introducing a straightforward genuine issue of material fact as to affirmative defense A and, indeed, the defendant prevails. But just because the defendant didn't brief and argue the remaining affirmative defenses it pleaded in its answer does not mean it is then precluded from raising any of them at trial. The same result applies here: the Court denied the Buyer's motion for summary judgment as to the amount of monetary damages on grounds unrelated to any of the Sellers' affirmative defenses. But just because those defenses were not raised or were not effective in the context of a motion for

summary judgment, does not alone mean they are abandoned for other purposes.

### 4. Conclusion

The Court **grants in part and denies in part** the Buyer's motion for summary judgment (**ECF No. 78**). In particular, the Court finds the Buyer entitled to judgment in its favor as to its request for specific performance and the Sellers' liability on its breach-of-contract claims as set forth in counts one through three of its complaint. Conversely, the Court finds the Buyer's motion insufficient to establish its entitlement to judgment as to either the amount of monetary damages to be awarded or its claim for negligent misrepresentation in count four of its complaint. The Court also **grants in part and denies in part** the Sellers' motion to supplement the record (**ECF No. 111**). The Court grants the Sellers' motion to the extent they seek to supplement the record with Habibi's deposition testimony. The Court also grants the motion as to the parties' *Daubert* briefing to the extent any of it was relevant to the Court's analysis of Habibi's testimony and opinions. The Court also strikes those aspects of the motion to supplement through which the Sellers sought to recycle or add to their summary-judgment opposition. Further, as explained above, the Court denies the Sellers' request that the Court first rule on the Sellers' *Daubert* motion before passing on the merits of the Buyer's motion for summary judgment.

**Done and ordered**, in Miami, Florida, on August 28, 2023.

Robert N. Scola, Jr.
United States District Judge